United States District Court
District of Connecticut
FILED AT BRIDGEPORT

Friday, March 29   ,2024

By _Djess Jacques_
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE SEARCH WARRANT

Case No. 3 : 24 - mj - 00302 - SDV

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANTS

I, Eric Milne, being first duly sworn, hereby depose and state as follows:

### REQUESTED WARRANTS

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the Apple ID associated with the iCloud accounts biznesb4p24@icloud.com ("Subject Account 1") and marleemichelle2816@icloud.com ("Subject Account 2") (together, the "Subject Accounts") that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, CA 95014-2084.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section § 841 (Possession with the Intent to Distribute Controlled Substances); Title 21, United States Code, Section § 846 (Conspiracy to Possess with the Intent to Distribute and Distribution of Controlled Substances); Title 21, United States Code, Section § 959 (Importation of Narcotics), and Title 21, United States Code, Section § 963 (Conspiracy to Import Narcotics) (the "Subject Offenses").  As such, I request permission to search the Subject Account1

and Subject Account 2, as identified in Attachments A-1 and A-2, respectively, for evidence of the Subject Offenses, as identified in Attachment B.

## AGENT BACKGROUND

3.      I am a Special Agent with the DEA and have been employed by the DEA since 2014.  During my tenure as a Special Agent with the DEA, I have conducted and participated in numerous investigations of criminal activity, including the investigation of domestic and international drug trafficking and money laundering. As a result of my involvement in the foregoing investigations, as well as my training, I am familiar with the tactics, methods, and techniques of persons who are involved in money laundering, domestic and international drug trafficking, and related activities. I am also familiar, through my training and experience, with the use of computers in criminal activity, the forensic analysis of electronically stored information, and the execution of search warrants to obtain electronically stored information.

4.      This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## JURISDICTION

5.      Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information

pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.      A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.      When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## PROBABLE CAUSE

8.      Since at least approximately May 2023, the DEA has been investigating the sale of narcotics in Connecticut by the ORJUELA Drug Trafficking Organization ("DTO"), which is comprised of individuals who participate in large scale drug trafficking relating to the importation of cocaine and heroin/fentanyl into the United States. The investigation to date has shown that members of this organization have conspired to sell narcotics in multiple locations, including Stamford and Norwalk, Connecticut from the importation of large quantities of narcotics into the United States.

9.      As explained more fully below, the investigation has revealed the ORJUELA DTO, supervised by Jose ORJUELA, is engaged in a widespread cocaine trafficking operation. Based on Title III intercepts, I have learned the ORJUELA DTO transports cocaine from Mexico to Ohio

and onward to Connecticut. Furthermore, I have learned that the ORJUELA DTO travels to New York City to conduct narcotics transactions to further the ORJUELA DTO.

### Probable Cause Regarding the Subject Offenses

10.     In May 2023, the DEA began investigating the ORJUELA DTO, initially through the use of a Confidential Informant (CI).  The CI has provided valuable information to investigators in regards to the ORJUELA drug trafficking organization, and has been cooperating with the Norwalk Police Department for approximately 2 years. The CI has been cooperating for favorable consideration from a recent arrest. During the course of this investigation, the CI was identified as a retail distributor of cocaine for the ORJUELA drug trafficking organization.

11.     The CI informed investigators that he/she was present with ORJUELA on a trip to Texas in May 2023. The CI reported ORJUELA and the CI traveled via rental car to Texas and drove to a hotel where they waited for a phone call. After ORJUELA received the phone call, ORJUELA flashed cash to an unidentified Mexican national who then provided ORJUELA with 5-30 kilograms of cocaine. DEA agents confirmed ORJUELA's travel to Texas in May of 2023 via historical cell sites on a cell phone known to be utilized by ORJUELA.  The CI also reported being present with ORJUELA on a trip to Texas on or around November 30, 2023, to December 4, 2023. The CI reported ORJUELA was supposed to purchase 5 kilograms of cocaine on this trip, and traveled with a bag containing $65,000 of United States Currency. The CI advised that ORJULEA met with the same Mexican national from the May 2023 trip, and another unidentified Mexican national at an Airbnb. The CI reported ORJULEA only received 1 kilogram of cocaine at this time, because he did not like the quality of the other 4 kilograms he was supposed to receive. DEA Agents were able to corroborate the travel of ORJULEA to Houston, Texas during these dates via E-911 data from a cell phone known to be utilized by ORJUELA. The CI further advised

that ORJUELA always travels with a firearm and urges his co-conspirators to protect themselves with a firearm.

12.     Thereafter, on October 4, 2023, investigators arranged for the controlled purchase of a sample of fentanyl from ORJUELA utilizing two DEA confidential sources, CS-1 and CS-2, both of whom are working for DEA for monetary compensation and have previously provided information to DEA that was proven reliable and credible. At the direction of investigators, CS-1 telephoned ORJUELA at (475) 291-7170. ORJUELA told CS-2 to meet him in the vicinity of Famous Pizza, 23 N Main St., Norwalk, CT.  ORJUELA told the CS to meet him in the vicinity of Famous Pizza, 23 N Main St., Norwalk, CT.  Investigators conducting physical surveillance observed CS-1 and CS-2 meet with ORJUELA, who was seated in his vehicle in the parking lot of Famous Pizza.  After the meeting, investigators surveilled CS-1 and CS-2 back to the neutral location. At the neutral location, investigators searched CS-1, CS-2 and CS-2's vehicle for contraband with negative results. CS-2 turned over ten glassine baggies commonly referred to as a "bundle" containing suspected fentanyl and the kel transmitter. According to CS-2, ORJUELA provided him with one bundle of fentanyl as a sample in exchange for a quantity of buy money. ORJUELA provided CS-2 with the price of $600 for 10 bundles of fentanyl, commonly referred to as a "brick," "stack," or "pack" and that he also could obtain fentanyl pills but needed to check on the price. ORJUELA provided the phone number (203) 957-0367 ("Subject Telephone 1") to the CS-2 as his contact telephone number.

13.     On October 10, 2023, investigators arranged for the controlled purchase of three bricks of fentanyl from ORJUELA in exchange for a quantity of buy money utilizing CS-2. Early that day, at the direction of SAs, the CS telephoned ORJUELA at Subject Telephone 1. ORJUELA responded with a text message to the CS to meet him at "4 glenwood ave Norwalk." Investigators

initiated surveillance in the vicinity of 4 Glenwood Ave which was a housing complex in Norwalk. Subsequently, CS-2 received a text message from ORJUELA to meet at "235 main ave Norwalk ct." Surveillance was established in the vicinity of 235 Main Ave. in Norwalk which is a shopping plaza. Investigators then surveilled the CS to that location. As CS-2 arrived, investigators observed Victor POLANCO-GENAO exit the Aromas Restaurant located in the shopping plaza, meet with CS-2 who was standing on the sidewalk of the shopping plaza and observed CS-2 follow POLANCO-GENAO into the restaurant. Investigators were able to observe through the restaurant windows that CS-1 was sitting at a table with ORJUELA and POLANCO-GENAO.

14.     Later, investigators observed CS-2, ORJUELA and POLANCO-GENAO exit the restaurant, walk to ORJUELA's vehicle, ORJUELA reach into the vehicle and hand a small item to CS-2 who then entered his vehicle and departed. Investigators surveilled CS-2 back to the neutral location, where CS-2 turned over three bundles of suspected and the kel transmitter. CS-2 stated ORJUELA misunderstood him and provided three bundles of fentanyl instead of three bricks of fentanyl in exchange for $150. ORJUELA told CS-2 that he had access to three bricks of fentanyl and could go and retrieve it, but CS-2 told ORJUELA not to worry as he was in a hurry. ORJUELA introduced POLANCO-GENAO to CS-2 as his partner. The narcotics sold to CS-2 field tested positive for fentanyl and were submitted to the DEA laboratory in New York City for confirmatory analysis. The DEA laboratory in New York City confirmed the presence of fentanyl and heroin.

15.     Thereafter, on February 8, 2024, United States District Judge Jeffrey A. Meyer authorized the interception of wire and electronic communications over (475) 291-7170 and (203) 957-0367 ("Subject Telephone 1") being utilized by ORJUELA in furtherance of his drug trafficking activities. Interception began on February 8, 2024 and concluded on March 9, 2024.

On March 7, 2024, Judge Meyer authorized the continued interception of wire and electronic communications over both phones. Interception began on March 7, 2024 and concluded as to the -7170 number based on inactivity. The wire investigation with respect to Subject Telephone 1 is ongoing.

16.     I have reviewed pertinent intercepted communications and/or corresponding call summaries/draft transcripts, in which the below-named subjects have participated and/or been referenced, and pertinent communications, and/or call summaries/draft transcripts, pertaining to the above-referenced Subject Offenses. A representative sampling of the pertinent communications intercepted over Subject Telephone 1 during the investigation is set forth below.

17.     On February 26, 2024, ORJUELA received an incoming call on Subject Telephone 1 from an unknown male (UM) utilizing Mexican telephone number 52-332-216-6177 (Session ID 975) which is transcribed as followed:

UM:     What's up, bro'?

ORJUELA:     Bro'. How's it going?

UM:     What's going down?

ORJUELA:     What you say? Hello. [Voices Overlap]

UM:     Chillin'. Chillin'. You talk to Alvaro? [Clears Throat]  You talk to Alvaro? [Voices Overlap]

ORJUELA:     Yea'! Yea! I just spoke to him like 10 minutes ago. I was waiting for you to call.

UM:     Did you understood what he say or he didn't say anything?

ORJUELA:     Yeah, he told me, he told me the- The location.

UM:     [Background: Beep.]

ORJUELA:     He told me, "He was gonna- Tell me more," about it.

UM:     Yeah. We're a- We're, we're talking about a open up a little office right there in Ohio. Pistolero [gunman].

ORJUELA:    Yeah. Yea, I heard. I head. I heard.

UM:     Yeah.

ORJUELA:    They did a little something over there in Ohio. Somebody got jammed up, up there.  [Voices Overlap]

UM:     What? Somebody got what?

ORJUELA:    I heard somebody got jammed up out there Ohio.

UM:     Oh, yeah?

ORJUELA:    Yeah.

UM:     Pretty sure there a lot [Audio Skips] jammed up.

ORJUELA:    Yeah. So, y'all talking about opening up a lane up there?

[Background: Music.]

UM:     Yeah and I was asking what's his name, uh? They said, "You uh, if we get it up there. You know how many times can you go down there?" It ain't that far, it's- I was checking it out it's like five (5) hours or no? Something like that.

ORJUELA:    I gotta check on the phone, I don't know how far it is from there.

UM:     I think I had checked one time it was like five (5) hours and some minutes or something like that.

ORJUELA:    I think is um.. let me see. So, Ohio. Hold on. Give me a second. [Pause] See how long, so? It's about- Mmm, it's about nine (9) hours from me.

UM:     Nine (9) hours? [ph]

ORJUELA:    Yeah.

UM:     I thought it was like five (5).

ORJUELA:    Yeah. Nah, it's like nine (9) hours from me. Which is not that bad. It's better than doing the 24.

UM:   Yeah. How... how many times can you go in like, something like a week or something like that?

ORJUELA:   Okay. And they're gonna be- To my, to my liking?

UM:   Yeah, they gotta be. Cause, I'ma [Clears Throat] I'ma fuck with somebody right there in uh-

ORJUELA:   Okay. Okay.

UM:   They, they about the K-Specialist just like you.

ORJUELA:   Okay.

UM:   So, there gonna send somebody over here to check 'em out before they take off, so.

ORJUELA:   Alright. Alright. Alright.

UM:   But they gotta be good before the go.

ORJUELA:   So, you said, "In about about what? A week," you said?

UM:   Uh, we're trying to fit it up. He's gonna hit me up today too cause, uh-m... Since, I gotta let my people now.

ORJUELA:   Right. Right. Well-

UM:   So we, we could go up there like twice a week.

ORJUELA:   Right, right ,right.

UM:   But we gotta go up there like with a - Like a, like a little high number, so. So, I gotta- So, I'm looking like for other options. Besides him like he could do so much and I- And I got other people, I got some other people like around the area.

ORJUELA:   Yeah. Yeah. Yeah.

UM:   That could go down there too, so.

ORJUELA:   Okay. Okay.

UM:   I'm trying to see.

ORJUELA:   Alright, so. Yeah, just let me know.  Keep me posted. You know? I'm ready to a- Grab a few.

[Background: Voices.]

UM:     How, how many times can you go up there? In like, how many times or how more many, can you do at a time? Every time you go down there.

ORJUELA:     Like, how many I'll grab?

UM:     Yeah.

ORJUELA:     I mean, I'll, I'll grab about- I mean like- Like, I could talk to the dude I'm dealing with right now. Cause he was asking me about "Chow"[PH]  the other day, so. I could tell him, if he wants to put in. Between me and him we could probably put, we could probably do like 10.

UM:     10?

ORJUELA:     Yeah. I'll-

UM:     It like, it be like once a week or something like that  or? [Voices Overlap]

ORJUELA:     Cause, he grabs, he grabs- Yeah. Yeah. Cause he, he already got people they- They throw it at him at- On the arm.  You know what I'm saying?

UM:     Yeah. Yeah.

ORJUELA:     But he was, he was asking me the other day, so. I could talk to him and see if he wanna put up some. And then I could let you know, how many?

UM:     Alright. Alright.

ORJUELA:     Cause, I know me I'll grab at the number you give me. I'll grab at least five (5).

UM:     Alright.

ORJUELA:     You know.

UM:     Alright.

ORJUELA:     So, I just talk to him- He.. [Voices Overlap]

UM:     And let me see, I could talk- I'll keep you posted whenever he-

UNKNOWN FEMALE:        [Background: ...with a customer.]

UM:     Then [U/I] then.

ORJUELA:     Alright, so. The numbers gonna be that same number?

UM:     Uh! I don't know what number was it, man. We're gonna do 15 right there.

ORJUELA:     You're, you're doing 15 over there?

UM:     Yeah.

ORJUELA:     Mmm. A'ight. Just let me know. Keep me posted. I'ma be waiting for your call then.

UM:     Alright. I'll let you know.

ORJUELA:     Alright. My brotha' be safe out there.

UM:     You too. Take it easy, Don.

ORJUELA:     Alright.

UM:     Alright, brother. Laters.

18.      Based on my training, experience and knowledge of this investigation, I believe the UM told ORJUELA that he exports multi-kilogram loads of cocaine from Mexico to Ohio, which are then stored at an armed stash house located in Ohio when he advised, "Yeah. We're a- We're, we're talking about a open up a little office right there in Ohio. Pistolero [gunman]."  I believe ORJUELA told the UM that he will travel to Ohio to obtain at least 5 kilograms of cocaine when ORJUELA stated, "Cause, I know me I'll grab at the number you give me. I'll grab at least five (5)." I further believe that the UM said that he will sell ORJUELA kilograms of cocaine for $15,000 per kilogram when ORJUELA asks, "You're, you're doing 15 over there?" the UM replies "Yeah."

19.      On March 10, 2024, ORJUELA traveled to the Bronx, New York to obtain what investigators believe to be 40 grams of heroin from an unknown male utilizing telephone number (917) 273-7976 ("-7976"). Prior to the trip, ORJUELA utilizing Subject Telephone 1, was in

contact over text message with -7976 (Session ID's 2006, 2007, 2012, 2013, 2014, 2015) on March 9, 2024.  In session 2012, -7976 sent Subject Telephone 1a text message in Spanish which was translated, "Tomorrow you can for the 40." Based on my training, experience and knowledge of this investigation, I believe -7976 is confirming with ORJUELA that they planned to conduct a 40-gram narcotics transaction on March 10, 2024.

20.    On March 10, 2024, investigators conducting electronic surveillance observed ORJUELA exit his residence, enter into one of his vehicles, and depart the area. In Session 2256, ORJUELA placed an outgoing call utilizing Subject Telephone 1 to 475-449-7161, known to investigators to be utilized by Victor POLANCO-GENAO, a.k.a. "Lali."  During the call ORJUELA stated, "I gotta go to the city real quick." ORJUELA later stated, "I gotta go scoop something up and shit."  Based on my training, experience and knowledge of this investigation, I believe ORJUELA told POLANCO-GENAO that he has to travel to New York City to obtain a quantity of narcotics. Approximately 2 hours later, in Session 2263 ORJUELA advised POLANCO-GENAO that he will be over shortly to pick up POLANCO-GENAO.  At that time, investigators conducted mobile surveillance on ORJUELA's vehicle, following it to to 10 Neptune Avenue, Norwalk, Connecticut.  Investigators observed POLANCO-GENAO exit 10 Neptune Avenue, Norwalk, Connecticut, and enter into the passenger seat of ORJUELA's vehicle.  In electronically intercepted Session 2264 on Subject Telephone 1 at approximately 7:24 p.m., ORJUELA placed an outgoing text utilizing Subject Telephone 1 to -7976 in Spanish which was translated to English as "I am on my way! To you 40 min." Mobile surveillance was maintained on ORJUELA's vehicle to I-95 southbound and was then terminated.

21.     Approximately 30 minutes later, ORJUELA utilizing Subject Telephone 1, placed an outgoing call to Kimberly DELACRUZ, who is ORJUELA's girlfriend also trafficking narcotics for the DTO, (Session ID 2278) which was transcribed as followed:

DELACRUZ: Hello.

POLANCO-GENAO: [Background: You don't have drugs?]

ORJUELA:     [Aside: Yes, throw it out, throw it out.] Yo I'm fucking, I'm fuck [Voice Overlap]

DELACRUZ: What happened?

ORJUELA:     I'm fucked right now.

DELACRUZ: What you mean what happened? [Voice Overlap]

ORJUELA:     I just fucked up Kim. My car, I got a flat tire and I need help.

DELACRUZ: Where are you [Voice Overlap]

ORJUELA:     And I got stuff on me. I'm by the Bronx, you know how I go take it to the Bronx [Voice Overlap]

DELACRUZ: Are you in your car [Voice Overlap]

ORJUELA:     Over here by Westchester Ave bro

POLANCO-GENAO: [Background: (U/I)]

ORJUELA:     I'm in my car man [Voice Overlap]

DELACRUZ: Send me, drive your location I'm coming.

ORJUELA:     I don't even know how to do that, call Lali

DELACRUZ: Alright.

ORJUELA:     Um, Lali gonna call you right now.

DELACRUZ: Alright.

POLANCO-GENAO: [Background:  I am going to send her the location]

22.     Based on my training, experience and knowledge of this investigation, I believe that ORJUELA had illegal narcotics inside of his vehicle when it got a flat tire. I believe when POLANCO-GENAO asked ORJUELA in the background of the call "You don't have drugs?", POLANCO-GENAO was asking ORJUELA if he had drugs inside of ORJUELA's vehicle. I further believe that when ORJUELA states to DELACRUZ, "And I got stuff on me," ORJUELA confirms that he has a quantity of illegal narcotics inside his vehicle.

23.     ORJUELA placed an outgoing call on Subject Telephone 1 to DELACRUZ (Session ID 2281). DELACRUZ advises to ORJUELA in the call, "Just relax babe. You got shit in the trunk. Try to find a backpack or something to put it in." Based on my training, experience and knowledge of this investigation, I believe that DELACRUZ knows that ORJUELA has a quantity of illegal narcotics inside of ORJUELA's vehicle in which she tells ORJUELA to then place it inside a backpack.

24.     ORJUELA then placed a call on Subject Telephone 1 to telephone number (203) 514-0922 utilized by Caleb VELEZ a.k.a. "KK" (Session ID 2286). Based on my knowledge of this investigation, pertinent TIII interceptions, and information provided by the Norwalk Police Department, I believe that VELEZ is a subordinate of ORJUELA, who takes directions from and is a narcotics customer of ORJUELA.  The call is transcribed below:

ORJUELA:     [Aside:  (U/I)]

UM:            [Background: *We are good, we are good*]

ORJUELA:     [Aside: Yea close it, close it, come on.]

VELEZ:        Yo.

ORJUELA:     Yo.

VELEZ:        Hey what up bro.

ORJUELA:    Yo I just caught a flat tire my nigga and I got mad shit on me. I need you to go with, with, with K and come over here with some shits to fix the tire, put the donut on it or something.

VELEZ:      Alright where are you? Where's K at.

ORJUELA:    K about to go over there to come scoop you.

VELEZ:      Alright, copy, I'm, ready.

ORJUELA:    Alright.

VELEZ:      Alright.

25.    Based on my training, experience and knowledge of this investigation I believe when ORJUELA states, "Yo I just caught a flat tire my nigga and I got mad shit on me. I need you to go with, with, and with K and come over here with some shits to fix the tire, put the donut on it or something," ORJUELA means that he has a large amount of narcotics inside of his vehicle and needs VELEZ to travel with DELACRUZ to fix the flat tire.

26.    Investigators believe that ORJUELA then continued traveling down to the Bronx, New York based on E-911 location data of Subject Telephone 1 and the intercepted communications. ORJUELA placed an outgoing call to -7976 (Session ID 2320) and advised the -7976 phone number, "Yes. A bit further down. In the same white car." Later in the call, ORJUELA states, "I'm here.. in front of *Saint Phillips*[PH] [Background: voices] The school." During the call, DELACRUZ can be heard speaking in the background saying, "Saint Phillips." Based on my training, experience and knowledge of this investigation, I believe DELACRUZ traveled with ORJUELA to pick up the 40 grams of narcotics that ORJUELA previously discussed with the 7976 phone number.

27.    Previously, on February 24, 2024, ORJUELA placed an outgoing call on Subject Telephone 1 to POLANCO-GENAO (Session ID 804). During the call, POLANCO-GENAO asks ORJUELA, "What's happening? Yo, I got a question. Yo, we're gonna do that?" ORJUELA responds, "What?" POLANCO-GENAO replies, "Today or what?  Cause these guy [is] hitting me

up. Haharry. [Harry]." Later in the call ORJUELA tells POLANCO-GENAO, "Harry is not what it is, bro! If he had some, he would've called me, fucker! I don't like that shit, bro.'" ORJUELA later tells POLANCO-GENAO, "No, cause they play around to much, bro. I need somebody that is reliable, bro!" POLANCO-GENAO advises ORJUELA, "But listen, listen, listen! Listen to what we can do. Give me a couple of minutes let me call some local people that I have here. We go and see what they have. If you like it, we buy it if not, well no.  If- Do you understand?"

28.     Based on my training, experience and knowledge of this investigation, I believe POLANCO-GENAO is attempting to introduce ORJUELA to sources of supply for narcotics when POLANCO-GENAO states "Today or what?  Cause these guy [is] hitting me up. Haharry. [Harry]". Additionally, when POLANCO-GENAO states, "But listen, listen, listen! Listen to what we can do. Give me a couple of minutes let me call some local people that I have here. We go and see what they have. If you like it, we buy it if not, well no.  If- Do you understand?".  I believe that POLANCO-GENAO is facilitating the introduction of ORJUELA to local sources of supply for narcotics.

29.     During the investigation of ORJUELA, DEA Bridgeport Resident Office ("BRO") investigators received information from DEA investigators in New York that the cell phone utilized by a Bronx, New York based known supplier of heroin and/or fentanyl, (929) 394-8243, was in the area of 10 Cove Avenue in Norwalk, Connecticut during the evening of January 23, 2024, pursuant to a judicially authorized ping order. Toll records for the -8243 phone number indicated that the phone contacted 475-258-0074 ("Subject Telephone 2") during this time. An administrative subpoena to T-Mobile indicated that Subject Telephone 2 is subscribed to Elizabeth Toribio at 10 Cove Ave., Apt 1R, Norwalk, Connecticut.  DEA Agents conducted an inquiry into law enforcement and open-source databases which revealed that Subject Telephone 2 is utilized

by Martin DE LOS SANTOS, a.k.a. "Marcelino Lopez," who has prior convictions for narcotics, weapons, and identity theft, and lives at 10 Cove Ave., Apt 1R, Norwalk, Connecticut.

30.     On January 24, 2024, DEA Agents observed a 2013 blue Honda Accord park in front of 10 Cove Ave, Norwalk.  An inquiry with the Connecticut Department of Motor Vehicles revealed that this vehicle is registered to Martin DE LOS SANTOS Alejandro at 10 Cove Ave., Apt 1R, Norwalk, Connecticut. Agents observed DE LOS SANTOS exit the driver's side door of the Honda, and a female child exit from the passenger side. DE LOS SANTOS checked the mailbox in front of 10 Cove Ave., and proceeded to enter into 10 Cove Ave., Apt 1R, Norwalk, Connecticut, utilizing keys to enter into the right front door of the residence. A few minutes later, Agents observed a 2023 Black Infiniti Qx80 park in front of 10 Cove Ave. An inquiry with the Connecticut Department of Motor Vehicles revealed that this vehicle is registered to Melizza Toribio at 10 Cove Ave., Apt 1R, Norwalk, Connecticut. An NCIC inquiry revealed that Melizza Toribio has a prior conviction for Criminal Possession of Weapon/Firearm. Agents observed Melizza Toribio exit the driver's side of the vehicle, and another younger Hispanic female exit the passenger side of the vehicle. They both entered into 10 Cove Ave, Apt 1R, Norwalk, Connecticut, with Melizza Toribio utilizing keys to enter into the right front door of the residence. A few moments later, Agents observed the same younger Hispanic female, dressed in a dark colored jacket, exit the front right door of 10 Cove Ave., Norwalk, Connecticut, and enter into the blue Honda Accord that DE LOS SANTOS had parked previously. Members of the BRO maintained surveillance on the blue Honda Accord until it parked in front of 32 Marlin Drive in Norwalk, Connecticut.

31.     Investigators then observed ORJUELA walk from his residence at 36 Marlin Drive, Norwalk, Connecticut, to his vehicle, a black Nissan Altima, which was parked on the street

in front of the residence, and was joined by the Hispanic female. At this time, it appeared that ORJUELA and the female engaged in conversation for several minutes. Based on my training and experience and knowledge of this investigation, I believe this to have been narcotics transaction based on the information provided by DEA New York, my knowledge that drug traffickers, especially those with prior convictions, often use other people as couriers to conduct drug deliveries, and specifically how the meeting took place inside ORJUELA's vehicle.

32.     Investigators checked toll records for ORJUELA's -7170 telephone and observed approximately 16 telephone contacts with Subject Telephone 2 between May 20, 2023 and October 4, 2023. Based on my training, experience, and knowledge of this investigation, this extensive period of contact ORJUELA and Subject Telephone 2 indicates an on-going narcotics conspiracy since at least May 20, 2023. However, there were no phone tolls observed by agents of any telephonic contact made on January 24, 2024; thus, I believe that contact for this meeting was made through the use of WhatsApp, iMessage, or other encrypted communication.

33.     On March 14, 2024, ORJUELA, utilizing Subject Telephone 1, placed an outgoing voice call to Subject Telephone 2, however no intercepted conversation took place. At this time, according to judicially authorized cell site location data, ORJUELA and Subject Telephone 1 were in the vicinity of 10 Cove Ave, Norwalk, Connecticut, the residence of DE LOS SANTOS. I have reviewed toll records of both Subject Telephone 1 and Subject Telephone 2 and have not observed any other telephonic contact on that date between any known phone numbers of ORJUELA and DE LOS SANTOS. Thus, I believe that other communications between ORJUELA utilizing Subject Telephone 1 and DE LOS SANTOS using Subject Telephone 2, occurred on non-traditional telephone encrypted communication. I further believe that communications related to the offenses under investigation have been and continue to be made over the Subject Accounts.

34.     On March 20, 2024, ORJUELA, using Subject Telephone 1, placed an outgoing voice call to (646) 617-6251 (Session ID 3361).  This telephone number was later identified as another telephone utilized by DE LOS SANTOS following an in-person meeting surveilled by law enforcement. During this intercepted phone conversation, as transcribed below, DE LOS SANTOS and ORJUELA planned to meet the following day to conduct a narcotics transaction, with DE LOS SANTOS providing ORJUELA with 50 grams or more of heroin/fentanyl.

ORJUELA: What are you doing?

DE LOS SANTOS: I just get off from work not too long ago. I'm going to shower. So, do you have anything to hold you off until tomorrow in the afternoon?

ORJUELA: Yes, I have... I have what I have in my bag that I had that day.

DE LOS SANTOS: Alright then.

ORJUELA: I have about... I have about 50 grams of 'Pedro'; that I have to make some money. You know.

DE LOS SANTOS: Mm-hmm.

ORJUELA: So, I'm doing that right now. You know.

DE LOS SANTOS: Right! I can give you something. I can give you something so you can start... to start paying the bills and do something. But let me ... give me until tomorrow to see if I grab... because what I have there of mine is just 50, so that way I can grab something bigger and I can give you a bit more.

ORJUELA: When you come, just let me know, so I know.

DE LOS SANTOS: Yes, around noon because tomorrow I go in at 4:00 in the morning and come out at 12:30.

ORJUELA: Okay.

DE LOS SANTOS: So by that time I'm already off and my buddy had seen me.

ORJUELA: Okay. Fine then.

DE LOS SANTOS: Alright [Voices Overlap]

ORJUELA: I'll wait for your call.

35.    Based on my training, experience and knowledge of this investigation I believe when DE LOS SANTOS asks ORJUELA "do you have anything to hold you off until tomorrow in the afternoon?" and ORJUELA answers "I have about 50 grams of 'Pedro,'" DE LOS SANTOS is asking if ORJUELA has enough narcotics to sell to his customers that night, and ORJUELA's answer means that he has about 50 grams of cocaine left to sell. When DE LOS SANTOS states "Right! I can give you something. I can give you something so you can start... to start paying the bills and do something. But let me ... give me until tomorrow to see if I grab... because what I have there of mine is just 50, so that way I can grab something bigger and I can give you a bit more," I believe that DE LOS SANTOS is informing ORJUELA that DE LOS SANTOS has 50 grams of heroin/fentanyl to give to ORJEULA, but will meet with another supplier the following day prior to meeting with ORJUELA, in order to obtain additional heroin/fentanyl to provide to ORJUELA.

36.    During the afternoon of March 21, 2024, in series of intercepted phone calls between Subject Telephone 1 and (646) 617-6251, ORJUELA and DE LOS SANTOS arranged to meet in Norwalk, Connecticut, for the purpose of the above-described narcotics transaction. Law enforcement conducted surveillance of the meeting which occurred in the parking lot of 680 Connecticut Ave, Norwalk, Connecticut.  Investigators observed ORJUELA parked in his vehicle, and DE LOS SANTOS arrived in his vehicle. DE LOS SANTOS, wearing a grey hooded sweatshirt bearing the words "DE LOS SANTOS PRESSURE WASH SERVICES," then exited his vehicle and entered into the rear passenger seat of ORJUELA's vehicle. Approximately twelve

minutes later, investigators observed DE LOS SANTOS exit the rear passenger seat of ORJUELA's vehicle and re-enter his own vehicle. This meeting was video recorded by law enforcement. Both vehicles then departed the parking lot. DE LOS SANTOS was surveilled by law enforcement to 10 Cove Ave, Norwalk, Connecticut, where he entered into apartment 1R.

37.    Based on my training and experience, judicially intercepted wire intercepts, and knowledge of this investigation, I believe this to have been narcotics transaction based on the information provided above and the manner in which the meeting occurred inside of ORJUELA's vehicle.

38.    Based on my training and experience, I know that the majority of narcotics that are imported into the United States are manufactured in, or transit through, Mexico. I know that one of the principal methods of transporting narcotics out of Mexico involves the use of smuggling narcotics over the southern border of the United States with Mexico, and storing those narcotics in stash houses within the United States, where it is then picked up by United States based distributors to be brought to the east coast of the United States. Furthermore, I know that New York City is a destination city of a large amount of cocaine and heroin/fentanyl that is trafficked from Mexico, and New York City is one of the primary areas of supply for cocaine and heroin/fentanyl that is trafficked into Connecticut to be sold locally. Obtaining the Subject Accounts' information will help further support evidence of importation of narcotics into the United States, and provide insight into the ORJUELA DTO's methods of trafficking narcotics.

**Probable Cause Regarding the Subject Accounts**

39.    For the reasons herein and based on my training, experience, and participation in this investigation, I respectfully submit that there is probable cause to believe that Subject Account 1 is used by ORJEULA and Subject Account 2 is used by DE LOS SANTOS, and the Subject Accounts contain evidence, fruits, and/or instrumentalities of the Subject Offenses. In particular,

and as explained further below, ORJUELA and DE LOS SANTOS's photos, encrypted messages with co-conspirators, and financial information may be found in the Subject Accounts and the Subject Accounts are likely to contain narcotics trafficking and financial information, location information, and IP address information that is evidence of the Subject Offenses.

40.     Based on my review of information received from WhatsApp pursuant to a judicially authorized pen register on Subject Telephone 1 and Subject Telephone 2, I learned the following:

    a. Subject Telephone 1, utilized by ORJUELA, exchanged approximately 21 WhatsApp messages between February 23, 2024 and March 20, 2024 with the telephone utilized by POLANCO-GENAO, a co-conspirator of ORJUELA in narcotics trafficking as previously described.

    a. Subject Telephone 2, utilized by DE LOS SANTOS, exchanged approximately 186 WhatsApp messages between February 22, 2024 and March 20, 2024 with the telephone utilized by POLANCO-GENAO, a co-conspirator of ORJUELA in narcotics trafficking as previously described.

41.     Based on numerous judicially authorized electronic telephone interceptions, such as a sampling of those provided above, and physically observing ORJUELA, I know that ORJUELA is the user of Subject Telephone 1. Based on my review of subpoena returns from Apple, I know that Subject Telephone 1 is the "FaceTime / iMessage Phone" for Subject Account 1 and Subject Account 1 is registered to "David Blake." This account was activated on September 10, 2023. Based on my training and experience, it is common for narcotics traffickers to register electronic devices under false names.

42.     Based on commonly used law enforcement databases and open-source information, I know that DE LOS SANTOS is the user of Subject Telephone 2.  Furthermore, a simple internet search of (475) 258-0074 revealed a website, www.westportpowerwashing.com.  On this website, the contact phone number of the business is listed as 475-258-0074, and the website logo contains the text "DE LOS SANTOS PRESSURE WASH SERVICES."  A search of Instagram revealed a publicly viewable social media profile with the username "DE.LOS.SANTOS.PRESSURE.WASH."   On multiple social media photographs that are publicly accessible on Instagram, I observed the same grey hooded sweatshirt that DE LOS SANTOS was wearing when he met with ORJUELA on March 21, 2024 to conduct a narcotics transaction. Additionally, these photographs reveal that the sweatshirt contains advertising for DE LOS SANTOS PRESSURE WASH SERVICES and a WhatsApp contact number of (475) 258-0074.  Based on my review of subpoena returns from Apple, I know that Subject Telephone 2 is the "FaceTime / iMessage Phone" for Subject Account 2 and Subject Account 2 is registered to "Michel DELOSANTOS" with an address of 10 Cove Ave, 1R, Norwalk, Connecticut. This account was activated on July 24, 2016.  Based on my training and experience, it is common for narcotics traffickers to register electronic devices under false names and/or variations of their name, and create companies in order to launder their illicit proceeds from narcotics trafficking.

43.     Based on my training, experience, and open-source research, I know that WhatsApp—like iMessage—is a messaging application for electronic devices that provides "end-to-end" encrypted messaging. I understand that providers of these encrypted applications do not store or keep logs of messages on the providers' servers once those messages are delivered, and that such messages are specifically encrypted to protect the messages' content from the providers

or third parties, including law enforcement. In other words, a message on an encrypted application is generally decipherable to only the sender and intended recipient of a message.

44.     Based on my training and experience, I have learned that individuals engaged in narcotics trafficking and money laundering, who have knowledge of and make use of encrypted applications often use such applications to engage in communications relating to their schemes precisely because they know that such encrypted communications generally cannot be intercepted by law enforcement or searched without access to the individual's specific account.

45.     Typically, as a practical matter, the only potential means by which law enforcement can obtain evidence of the content of the communications sent using encrypted applications is by conducting a search of the sender or recipient's electronic device upon which the application may be installed. In certain instances, however, a backup of a cellular device stored on Apple accounts, like the Subject Account, may include certain communications from encrypted applications, like WhatsApp and iMessage. At the very least, data from Apple's App Store for the Subject Accounts would reveal whether a particular device downloaded a particular encrypted application, like WhatsApp, evidencing the user's method and plan.

46.     Based on my training and experience, I know that Apple maintains certain location information and content that may identify a user's location during a specific time period. Location information could also be evidence of the Subject Offenses in that it could show, for example, where the Subject Accounts were created or help to co-locate the user the Subject Accounts with co-conspirators in the Subject Offenses.

47.     Based on my training and experience in narcotics trafficking and money laundering investigations, I know that the Subject Accounts can be used to identify evidence regarding corporate information, banking information, and the source and method for moving funds. In

particular, these accounts can be used by co-conspirators to share photographs, videos, provide instructions, and training, as well as connect and communicate with co-conspirators who can assist with moving money or narcotics in violation of the Subject Offenses.

48. Information obtained from the Subject Accounts will likely also provide evidence identifying ORJUELA as the user of the Subject Account 1 and DE LOS SANTOS as the user of Subject Account 2, as well as identifying other co-conspirators who may be involved in the Subject Offenses, in addition to identifying their physical locations. This is so because individuals who engage in narcotics trafficking and money laundering sometimes require a way to stay in touch that is portable. In this regard, such individuals will use iPhones that are registered to Apple's servers through an iCloud account, such as the Subject Accounts, which can be accessed via the Internet from anywhere in the world. They commonly use such means of communication to communicate with individuals with whom they ultimately intend to meet for illegal purposes, as well as with friends and family at home. Moreover, such portable means of communication facilitate logistical arrangements and provide an easy and cost-effective means of communicating with individuals in the United States as well as other places abroad.

b. Apple also typically maintain records relating to Internet searches and websites visited by the user of the account in question. Because individuals such as ORJUELA and DE LOS SANTOS who are engaged in the Subject Offenses often have used the internet for, among other things, accessing banking information over the Internet and tracking parcels, mail or cargo involved in narcotics trafficking, I submit that there is probable cause to believe that the Subject Accounts will contain some of those types of evidence as they relate to the Subject Offenses.

c. Furthermore, the Subject Accounts are likely to contain information concerning email contacts, group memberships, and patterns of electronic communications with individuals

associated with the Subject Offenses as well as evidence that is probative of ORJUELA and DE LOS SANTOS and any co-conspirators' social networks, contacts, travel, banking and other financial facilities, and potential knowledge of or involvement in one or more of the Subject Offenses. For example, source and destination addresses of electronic mail messages, including the "To:" "Cc:" and "Bcc:" (destinations), and "From:" (source) for all electronic communications sent from or received by any email account that is backed up to the Subject Accounts, as well as the substance of those communications, are likely to provide useful information about other individuals who have had contact with ORJUELA and DE LOS SANTOS regarding the Subject Offenses. Similarly, messages on the Subject Accounts with other individuals likely will include evidence of communications with other co-conspirators about the Subject Offenses, evidence of common devices, concealment techniques, pertinent location data, and personal communications that will be evidence of ORJUELA and DE LOS SANTOS' use of the Subject Accounts and evidence of the Subject Offenses.

### Information about Apple ID and iCloud

49.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

50.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.   iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.   iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.   iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.   Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.   Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.   Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.   App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

51.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

52.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email

addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

53.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

54.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

55.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial

number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

56.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

57.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

58.     The stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Further, files connected to an Apple ID may evidence, among other things, narcotics trafficking if, for example, the user of an Apple ID keeps digital narcotics ledgers.

59.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

60.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

61.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to surreptitiously communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

### Evidence, Fruits and Instrumentalities

62.     Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment B to the proposed warrant.

### Review of the Information Obtained Pursuant to the Warrant

63.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section II of Attachment B to the proposed warrant.

64.     In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## Request for Non-Disclosure and Sealing Order

65.     The scope of this ongoing criminal investigation, and existence as to ORJUELA and DE LOS SANTOS, is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.

66.     As is set forth above, the targets of the investigation include overseas individuals who may refrain from international travel to an area from which they could be extradited to the United States if alerted to the investigation. *See* 18 U.S.C. § 2705(b)(2), (5). Moreover, the targets of this investigation are known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3).

67.     Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of six months from issuance, subject to extension upon application to the Court, if necessary.

68.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until September 28, 2024, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## CONCLUSION

69.     Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.

Eric Milne
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this   29th   day of March 2024 at Bridgeport, Connecticut.

THE HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

**Attachment A-1**

**Subject Account 1**

This warrant is directed to Apple, Inc. (the "Provider"), headquartered at One Apple Park Way in Cupertino, California, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud account "biznesb4p24@icloud.com" (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section B.I. below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section B.II. below.

**Attachment A-2**

**Subject Account 2**

This warrant is directed to Apple, Inc. (the "Provider"), headquartered at One Apple Park Way in Cupertino, California, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud account "marleemichelle2816@icloud.com" (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section B.I. below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section B.II. below.

**Attachment B**

**I. Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.     The contents of all emails associated with the Subject Account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which

each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

    d.    The contents of all instant messages associated with the Subject Account, including stored or preserved copies of instant messages (including iMessages, SMS messages, WhatsApp messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

    e.    The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

    f.    All activity, connection, and transactional logs for the Subject Account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the Subject Account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

## II. Review of Information by the Government

1.      Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section § 841 (Possession with the Intent to Distribute Controlled Substances); Title 21, United States Code, Section § 846 (Conspiracy to Possess with the Intent to Distribute and Distribution of Controlled Substances); Title 21, United States Code, Section § 959 (importation of narcotics), and Title 21, United States Code, Section § 963 (conspiracy to import narcotics) (the "Subject Offenses"):

   a. Evidence of the identity(ies) of the user(s) of the Subject Accounts, as well as other co-conspirators in contact with the Subject Accounts;
   b. Evidence relating to the geolocation of the user(s) of the Subject Accounts, at times relevant to the Subject Offenses created between September 10, 2023 and the present;
   c. Evidence relating to the participation in the Subject Offenses by ORJUELA, DE LOS SANTOS, co-conspirators, and others using or in communication with the Subject Account created, sent, or received between September 10, 2023 and the present;

d. Evidence concerning financial institutions and transactions in furtherance of the Subject Offenses created, sent, or received between September 10, 2023 and the present;

e. Communications evidencing the Subject Offenses created, sent, or received between September 10, 2023 and the present;

f. Evidence showing the states of mind of ORJUELA, DE LOS SANTOS, and co-conspirators as it relates to the Subject Offenses, including any motive for narcotics trafficking, money laundering, or other evidence of the Subject Offenses created, sent, or received between September 10, 2023 and the present;

g. Evidence of and relating to computers or other online accounts and facilities (such as cellphones and email addresses) controlled or maintained by the user(s) of the Subject Accounts;

h. Photographs depicting travel, narcotics trafficking, money laundering or other evidence of the Subject Offenses created, sent, or received between September 10, 2023 and the present;

i. Evidence of web searches evidencing the account holders' location, travel, attempts to evade law enforcement, narcotics trafficking, money laundering or other evidence of the Subject Offenses created, sent, or received between September 10, 2023 and the present;

j. Evidence indicating how, when, and where the Subject Accounts were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the Subject Offenses and to the account owner created, sent, or received between September 10, 2023 and the present;

k. Passwords or other information needed to access or identify computer or other online accounts, post office boxes, security deposit boxes, storage facilities, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located; and

l. Evidence of efforts to conceal any of the above evidence or conduct, including by deleting or destroying evidence, created, sent, or received between September 10, 2023 and the present.